# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>$37,564,565.25 in ACCOUNT NUMBER XXXXXXXX9515 AT MORGAN STANLEY, IN THE NAME OF ANICORN LLC;<br><br>$21,113.21 in ACCOUNT NUMBER XXXXXX9537 AT WELLS FARGO, N.A., IN THE NAME OF ARTEMUS GROUP, LLC;<br><br>$25,002,568.63 in ACCOUNT NUMBER XXXXXX1078 AT CITIBANK, IN THE NAME OF HIGGINBOTHAM LAW P.C.;<br><br>$11,314,205.00 in ACCOUNT NUMBER XXXXXX9974 AT CITIBANK, IN THE NAME OF HIGGINBOTHAM LAW P.C.;<br><br>Defendants *in rem*. | Civil Action No. 18-cv-2795 |

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

COMES NOW, Plaintiff, the United States of America, by and through the United States Department of Justice and its undersigned attorneys, and brings this verified complaint for forfeiture in a civil action *in rem* against funds contained in various bank accounts. In support of its case, plaintiff states as follows:

## NATURE OF THE ACTION

1.      This is a civil action *in rem* to forfeit to the United States the above-captioned Defendant Properties to the use and benefit of the Plaintiff, the United States of America. The Defendant Properties are subject to forfeiture pursuant to Title 18, United States Code, Section 981 (a)(1)(C), as property

constituted or derived from proceeds traceable to an offense constituting specified unlawful activity as defined in Title 18, United States Code, Sections 1956(c)(7) and 1961(1). These specified unlawful activities include, but are not limited to: bank fraud, in violation of Title 18, United States Code, Section 1344; conspiracy to commit bank fraud, in violation of Title 18, United States Code, Section 371; and making false statements to a financial institution, in violation of Title 18, United States Code, Section 1014. The Defendant Properties are also subject to forfeiture pursuant to Title 18, United States Code Section, 981(a)(1)(A), as property involved in a transaction or attempted transaction in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i), 1956(a)(2)(B)(i), 1956(h), and 1957, and as property traceable to any such property.

2.      For its claims against the Defendant Properties, the United States alleges as follows upon information and belief.

## THE DEFENDANT PROPERTIES

3.      The Defendant Properties consist of:

a.  $37,564,565.25 in bank funds seized from Account Number XXXXXXXX9515 at Morgan Stanley, held in the name of Anicorn, LLC ("ANICORN ACCOUNT"), on March 9, 2018, pursuant to a federal seizure warrant issued upon a finding of probable cause by the Honorable Robin Meriweather of the U.S. District Court for the District of Columbia;

b.  $21,113.21 in bank funds seized from Account Number XXXXXX9537 at Wells Fargo Bank, N.A., held in the name of Artemus Group, LLC ("ARTEMUS ACCOUNT"), on July 2, 2018, pursuant to a federal seizure warrant issued upon a finding of probable cause by the Honorable G. Michael Harvey of the U.S. District Court for the District of Columbia ;

c. $25,002,568.63 in bank funds seized from Account Number XXXXXX1078 at Citibank, held in the name of Higginbotham Law P.C. ("HIGGINBOTHAM 1078 ACCOUNT"), on January 10, 2018, and February 27, 2018, pursuant to a federal seizure warrant issued upon a finding of probable cause by the Honorable Deborah A. Robinson of the U.S. District Court for the District of Columbia; and

d. $11,314,205.00 in bank funds seized from Account Number XXXXXX9974 at Citibank, held in the name of Higginbotham Law P.C. ("HIGGINBOTHAM 9974 ACCOUNT"), on January 10, 2018, pursuant to a federal seizure warrant issued upon a finding of probable cause by the Honorable Deborah A. Robinson of the U.S. District Court for the District of Columbia.

## JURISDICTION AND VENUE

4. Plaintiff brings this action *in rem* in its own right to forfeit the Defendant Properties. This Court has subject matter jurisdiction over an action commenced by the United States, pursuant to Title 28, United States Code, Section 1345, and over an action for forfeiture, pursuant to Title 28, United States Code, Section 1355(a). This Court also has jurisdiction over this particular action pursuant to Title 18, United States Code, Section 981.

5. This Court has *in rem* jurisdiction over the Defendant Properties pursuant to Title 28, United States Code, Section 1355(b)(1).

6. Venue is proper in this district pursuant to Title 28, United States Code, Section 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture took place in this district, and pursuant to Title 28, United States Code, Section 1395(b), because certain of the Defendant Properties are located in this district.

**FACTUAL ALLEGATIONS**

**I.      The Scheme to Launder JHO LOW's Money into the United States for Lobbying Purposes**

7.      In 2017, a Malaysian businessman named Low Taek Jho (JHO LOW) funneled tens of millions of dollars into the United States to pay individuals to lobby high-level U.S. government officials to influence, *inter alia*, an ongoing U.S. Department of Justice (DOJ) criminal investigation of JHO LOW and related civil forfeiture proceedings over numerous of JHO LOW's assets.  As described in greater detail below, JHO LOW's money was funneled through various U.S. bank accounts set up by, and under the control of, an entertainer and businessman named Prakazrel "Pras" MICHEL.  With the assistance of George HIGGINBOTHAM, MICHEL opened multiple accounts at financial institutions in the United States to maintain money funneled into the United States at JHO LOW's direction; however, the true source and purpose of the funds were not disclosed to the banks and were actively concealed from them. MICHEL then disbursed JHO LOW's funds to various individuals and entities to facilitate a lobbying campaign to represent the interests of various foreign nationals and entities, including JHO LOW, in the United States. At all relevant times, HIGGINBOTHAM, who was employed at DOJ in a non-lawyer position, was not involved in any way in the DOJ's investigation of JHO LOW and failed to influence any aspect of DOJ's investigation of 1MDB and JHO LOW.

8.      Two of the individuals who received JHO LOW's money through MICHEL and his entities are INDIVIDUAL NO. 1 and INDIVIDUAL NO. 2.   INDIVIDUAL NO. 1 owns several businesses, including an investment firm.  INDIVIDUAL NO. 2 is an associate of INDIVIDUAL NO. 1 and a longtime political fundraiser.

9.      On or about October 3, 2018, JHO LOW was indicted on federal charges for conspiring to violate the Foreign Corrupt Practices Act by paying bribes to foreign public officials and conspiring to launder billions of dollars embezzled from 1Malaysia Development Berhad (1MDB), a strategic

investment and development company that was wholly owned by the Government of Malaysia through its Ministry of Finance.  JHO LOW, together with others, is also alleged to have laundered hundreds of millions of dollars of stolen 1MDB funds into the United States.  This was accomplished through the acquisition of a wide variety of assets, including luxury real estate and jewelry, the financing of Hollywood motion pictures, and the alleged payment of bribes using the stolen funds.

10.     In July 2016, DOJ filed multiple civil forfeiture complaints in the United States District Court for the Central District of California seeking the forfeiture of over $1 billion in assets associated with the laundering of funds misappropriated from 1MDB.  The named assets in these civil forfeiture complaints include, *inter alia*, several parcels of luxury real estate, interests in real estate development projects, a luxury hotel in Beverly Hills, a jet aircraft, and "The Wolf of Wall Street" motion picture and related royalties.  JHO LOW was named in several of the civil forfeiture complaints as one of the primary architects and beneficiaries of the 1MDB embezzlement scheme.

**A.  MICHEL Agrees to Assist JHO LOW and Seeks Assistance from INDIVIDUAL NO. 2 and INDIVIDUAL NO. 1**

11.     In 2016, JHO LOW's brother sought MICHEL's assistance with securing representation for JHO LOW in the United States to assist him on the 1MDB civil forfeiture investigation.  MICHEL contacted INDIVIDUAL NO. 2, and INDIVIDUAL NO. 2 recommended retaining LAW ENTERPRISE NO. 1, a law firm owned by INDIVIDUAL NO. 1's wife from their personal residence.

12.     After JHO LOW expressed interest in retaining INDIVIDUAL NO. 1 and LAW ENTERPRISE NO. 1, MICHEL met in person with INDIVIDUAL NO. 1 and INDIVIDUAL NO. 2 and explained JHO LOW's situation in the 1MDB matters.

13.     INDIVIDUAL NO. 1 indicated to MICHEL that although he was willing to assist JHO LOW, he would not take any compensation directly from JHO LOW in exchange for his services.  Eventually, MICHEL and INDIVIDUAL NO. 1 agreed that MICHEL would act as an intermediary to

5

pay INDIVIDUAL NO. 1.   INDIVIDUAL NO. 1 wanted $15 million in compensation, but MICHEL

negotiated the price down to approximately $8 million.

14.     On March 5, 2017, INDIVIDUAL NO. 2 emailed INDIVIDUAL NO. 1 a copy of the

"Wolf of Wall Street" civil forfeiture complaint filed by DOJ, seeking the forfeiture of the rights to the

motion picture "The Wolf of Wall Street."  That same day, INDIVIDUAL NO. 2 emailed INDIVIDUAL

NO. 1 a Bloomberg article titled "Jho Low Trusts Ask to File Late Claims in Forfeiture Lawsuits."

15.     On March 12, 2017, INDIVIDUAL NO. 2 emailed INDIVIDUAL NO. 1 and

INDIVIDUAL NO. 1's assistant under the subject line, "Re: Meeting for [INDIVIDUAL NO. 1],

[INDIVIDUAL NO. 2] and Pras."  The body of the email read, in part, "We had to change this meeting

due to [INDIVIDUAL NO. 1]'s travel schedule - so per my conversation with [INDIVIDUAL NO. 1] --

Mtg with Pras will now be at 8:30 am -at the offices on Monday March 13th - and please also hold in

[INDIVIDUAL NO. 1]'s schedule 3:30 - 4:30 pm Monday (tomorrow) in case there is need for an

additional meeting."    INDIVIDUAL NO. 1 responded that same day, "Great. Confirmed."

INDIVIDUAL NO. 1's assistant followed up by asking INDIVIDUAL NO. 2 which appointment she

wanted to keep, and INDIVIDUAL NO. 2 responded, "We are keeping both."

### B.  Use of LAW ENTERPRISE NO. 1 to Funnel Payments from JHO LOW to INDIVIDUAL NO. 1 and Creation of Anicorn, LLC and Artemus Group, LLC to Receive International Wires from JHO LOW

16.     On March 13, 2017, INDIVIDUAL NO. 2 emailed MICHEL a draft retainer agreement

between LAW ENTERPRISE NO. 1 and JHO LOW.  The draft agreement stipulated that JHO LOW

would pay an $8 million retainer fee upfront and an additional $75 million success fee if the "matter" was

resolved within 180 days, or $50 million if the "matter" was resolved within 365 days.  The draft

agreement included an Exhibit A explaining that the "matter" referred to DOJ's 1MDB forfeiture

proceedings.

17.     On March 20, 2017, a financial advisor for MICHEL, INDIVIDUAL NO. 4 established two new limited liability companies in the State of Delaware: Anicorn, LLC, and Artemus Group, LLC. Bank accounts for those two new entities were opened at City National Bank in California on or about March 30, 2017.

18.     On March 22, 2017, INDIVIDUAL NO. 2 emailed INDIVIDUAL NO. 1 about setting up another meeting between her, INDIVIDUAL NO. 1, and MICHEL.  The body of the email read, in part, "Can we do a meeting with [INDIVIDUAL NO. 1] with Pras and me - Friday afternoon?  Maybe around 4 pm?  Let me know if that works for his schedule."  INDIVIDUAL NO. 1 responded that same day, "Great.  Looking forward to seeing you both."

19.     On April 6, 2017, MICHEL forwarded to HIGGINBOTHAM the draft retainer agreement between LAW ENTERPRISE NO. 1 and JHO LOW.   A few days later, on April 10, HIGGINBOTHAM sent MICHEL an email with a draft "Consulting Agreement" between LAW ENTERPRISE NO. 1 and Anicorn, LLC.   The "Consulting Agreement" stated that Anicorn was "engaged in the business of providing strategic consulting and risk management services to private and corporate clientele who are require [sic] effective and efficient solutions to highly complex and highly confidential matters."   The agreement stipulated that Anicorn would pay an $8 million retainer fee to LAW ENTERPRISE NO. 1 on behalf of Anicorn's "client," along with a $75 million success fee if the "Asset Resolution Matter" referred to in Exhibit A was resolved within 180 days, or $50 million if the "Asset Resolution Matter" was resolved within 365 days.   The draft "Consulting Agreement" included as Exhibit A the retainer agreement between LAW ENTERPRISE NO. 1 and JHO LOW, as well as the separate Exhibit A to that retainer agreement referring to the "matter" as DOJ's 1MDB forfeiture proceedings.

20.     On April 28, 2017, HIGGINBOTHAM emailed MICHEL under the subject line, "Anicorn w/ WuTang."[1]   In the body of the email, HIGGINBOTHAM wrote, "Text me when you get this.  I will need names and account numbers to finish this."   The attached document was a postdated May 1, 2017 "Retainer and Fee Agreement – Consulting Agreement" between Anicorn and an unnamed "client," which stipulated to an initial retainer from the "client" to Anicorn of $25 million, and a success fee of $300 million following successful resolution of the "matter."   Exhibit A to the agreement identified the "matter" as DOJ's 1MDB forfeiture proceedings.

### C.  MICHEL, INDIVIDUAL NO. 2, and INDIVIDUAL NO. 1 Meet JHO LOW in Thailand

21.     In early May 2017, MICHEL traveled to Thailand along with INDIVIDUAL NO. 2 and INDIVIDUAL NO. 1 to meet with JHO LOW in person.  On May 1, 2017, INDIVIDUAL NO. 2 emailed INDIVIDUAL NO. 1 and INDIVIDUAL NO. 1's assistant a link to the Shangri-La Hotel in Bangkok, Thailand, and wrote, in part, "Please send me the hotel confirmation for both [INDIVIDUAL NO. 1]'s room and mine once you get it online and I will forward."  That same day, INDIVIDUAL NO. 2 emailed MICHEL telling him to book a room at the Shangri-La Hotel and to send her the confirmation.  MICHEL responded, "jo is booking our hotel," and later followed up, "Also send me [INDIVIDUAL NO. 1]'s wire info."  INDIVIDUAL NO. 2 replied by providing the wire information for an account in the name of LAW ENTERPRISE NO. 1.  Also that same day, in response to a question from INDIVIDUAL NO. 1's assistant about whether she should cancel INDIVIDUAL NO. 1's hotel room reservation, INDIVIDUAL NO. 2 emailed INDIVIDUAL NO. 1's assistant, "Yes all rooms are booked by Pras already."

22.     On May 2, 2017, INDIVIDUAL NO. 2 emailed INDIVIDUAL NO. 1's assistant and cc'd INDIVIDUAL NO. 1 and MICHEL, "please send [INDIVIDUAL NO. 1]'s itinerary w flight info to me

---

[1]  "Wu Tang" was a code name HIGGINBOTHAM and MICHEL used for JHO LOW.

and Pras copied Here."  That same day, INDIVIDUAL NO. 2 emailed INDIVIDUAL NO. 1, "Since u

land earlier - Pras and I will see you at arrivals. International arrivals should all be in same area.  Thanks

and bon voyage – here's to the start of an exciting and prosperous adventure!"  INDIVIDUAL NO. 1

responded, "Yes."

23.    During the meeting in Thailand, INDIVIDUAL NO. 1 advised JHO LOW that he would

sit down with JHO LOW's legal team and figure out the best way to get to a settlement on the 1MDB

matters.  MICHEL was also present at this meeting.

### D.  JHO LOW's Payments to the ANICORN ACCOUNT and Transfers to LAW ENTERPRISE NO. 1 After Thailand Trip

24.    On May 8, 2017, following the meeting with JHO LOW in Thailand, the ANICORN

ACCOUNT[2] received a wire transfer for approximately $2.8 million from an entity in Hong Kong called

Lucky Mark (HK) Trading Limited.  Specifically, the $2.8 million was sent from Lucky Mark (HK)

Trading Limited's Hong Kong bank account at the Industrial and Commercial Bank of China.  Although

there is in fact a souvenir manufacturing company called "Lucky Mark International (HK) Limited," that

company was formed in 2014, and that company was not the source of the wire transfers to the ANICORN

ACCOUNT.  Lucky Mark (HK) Trading Limited is a corporate entity that exists in part to transfer JHO

LOW's money.  The $2.8 million transferred from Lucky Mark (HK) Trading Limited into Anicorn—as

well as all subsequent transfers from Lucky Mark (HK) Trading Limited—all constituted transfers of

funds believed to be in JHO LOW's custody or control.

---

[2] As stated above, and detailed in Sections II-III below, the bank accounts for Anicorn and Artemus were
held at City National Bank prior to September 29, 2017.  Thus, all references to transactions involving
the ANICORN ACCOUNT and the ARTEMUS ACCOUNT that take place before September 29, 2017,
actually refer to the predecessor incarnations of these accounts at City National Bank.

25.     Prior to the May 8, 2017 wire transfer, the balance in the ANICORN ACCOUNT was approximately $48,000.  That same day, MICHEL obtained a cashier's check from the ANICORN ACCOUNT for $702,000 payable to LAW ENTERPRISE NO. 1, which was immediately credited to the LAW ENTERPRISE NO. 1 account.  MICHEL also made a separate wire transfer of $48,000 to LAW ENTERPRISE NO. 1 from the ANICORN ACCOUNT.  Also that same day, CORPORATION NO. 2[3] transferred $250,000 to the LAW ENTERPRISE NO. 1 account, and $250,000 was transferred from the ANICORN ACCOUNT to CORPORATION NO. 2 one day later.  Prior to the $1 million in transfers on May 8, 2017, the balance in the LAW ENTERPRISE NO. 1 account was approximately $3,000.  By May 12, 2017, approximately $900,000 of the $1 million was transferred from the LAW ENTERPRISE NO. 1 account to one of INDIVIDUAL NO. 1's business accounts.

26.     On May 17, 2017, the ANICORN ACCOUNT received an additional approximately $3 million wire transfer from Lucky Mark (HK) Trading Limited.  This was the only credit to the ANICORN ACCOUNT since the May 8, 2017 wire transfer of approximately $2.8 million from Lucky Mark (HK) Trading Limited.  That same day, $3 million was transferred from the ANICORN ACCOUNT to the LAW ENTERPRISE NO. 1 account, which at the time had a balance of approximately $1,720.  The following day, May 18, 2017, LAW ENTERPRISE NO. 1 transferred $500,000 to one of INDIVIDUAL NO. 1's business accounts and $900,000 to an account in the name of CORPORATION NO. 1, which is an entity affiliated with INDIVIDUAL NO. 2.  Within one week, LAW ENTERPRISE NO. 1 transferred an additional $950,000 to one of INDIVIDUAL NO. 1's business accounts.

27.     On May 18, 2017, the day after CORPORATION NO. 1 received $900,000 from LAW ENTERPRISE NO. 1, INDIVIDUAL NO. 2's sister emailed INDIVIDUAL NO. 2 and wrote, in part,

---

[3] CORPORATION NO. 2 is an entity affiliated with one of MICHEL's and JHO LOW's business associates.

"Travel safe and Good luck."  INDIVIDUAL NO. 2 responded, in part, "Rest assured – I will let mom know when any money is coming and I'm sure she will alert you – so u can get it from Pras.  Unless told otherwise from u via email – I will continue to give mom and dad their portion."  That same day, INDIVIDUAL NO. 2's sister emailed INDIVIDUAL NO. 2, copying their mother and father, under the subject line "Fees."  The body of the email stated, in part, "Per a discussion, with mom and dad please see below.  And all monies or fees earned, (10% of Pras Michel and you) are to be given directly to me.  The agreement I have with dad is between and him and me [sic].  (Mom and dad are CC'd)  Therefore, and all all [sic] fees should be dispersed directly to me or designated entity, not to you and then to mom or dad (as previously done)."

28.     On May 25, 2017, the ANICORN ACCOUNT received a wire transfer of approximately $2.7 million from Lucky Mark (HK) Trading Limited.  This was the only credit to the ANICORN ACCOUNT since the May 17, 2017 wire transfer of approximately $3 million from Lucky Mark (HK) Trading Limited.  The next day, May 26, approximately $2 million was transferred from the ANICORN ACCOUNT to the LAW ENTERPRISE NO. 1 account.  That same day, INDIVIDUAL NO. 1 emailed INDIVIDUAL NO. 2, "Please call me."  Also that same day, LAW ENTERPRISE NO. 1 transferred $600,000 to CORPORATION NO. 1 and $1 million to an account in the name of INDIVIDUAL NO. 1's wife.  Within one week, an additional $650,000 was transferred from LAW ENTERPRISE NO. 1's account to one of INDIVIDUAL NO. 1's business accounts.

### E.  Efforts to Influence 1MDB Matters

29.     Following the series of initial payments from Lucky Mark (HK) Trading Limited to the ANICORN ACCOUNT—which totaled approximately $8.5 million—MICHEL, INDIVIDUAL NO. 1, INDIVIDUAL NO. 2, and HIGGINBOTHAM, among others, were involved in efforts to influence the 1MDB investigation.

30.     On August 7, 2017, for example, INDIVIDUAL NO. 1's assistant emailed INDIVIDUAL NO. 1 under the subject line, "Malaysia Talking Points *Final*."  The body of the email contained a series of talking points apparently prepared for MALAYSIAN OFFICIAL NO. 1 in anticipation of a meeting between MALAYSIAN OFFICIAL NO. 1 and U.S. GOVERNMENT OFFICIAL NO. 1.  One of the talking points, for example, read, "[U.S. GOVERNMENT OFFICIAL NO. 1] may mention [INDIVIDUAL NO. 1]'s name.  If he does, I will confirm that I know [INDIVIDUAL NO. 1] and that he wants a closer relationship between the USA and Malaysia."  Several other talking points focused specifically on the 1MDB investigation and conveyed that U.S. involvement in the investigation was unnecessary: "1MDB message on all levels this is being handles [sic] by Saudia [sic] Arabia and Abu Dhabi, and Malaysia.  Malaysian Attorney General has publically announced that no American has been harmed by any 1MDB transaction[.]  The involvement of US prosecutors has caused unnecessary tension American [sic], and could cause a negative reaction among Malaysians[.]  Malaysian Attorney General have [sic] publically announced no harm has been caused to any investors[.]  Finally, I will send Malaysian Attorney General ahead of my visit to the US in September to meet [U.S. GOVERNMENT OFFICIAL NO. 2].  I would like an introduction to [U.S. GOVERNMENT OFFICIAL NO. 3]."[4]

**F.  Additional Payments to the ANICORN ACCOUNT and the ARTEMUS ACCOUNT**

31.     On August 9, 2017, the ANICORN ACCOUNT received an additional wire transfer of approximately $12.8 million from Lucky Mark (HK) Trading Limited.

32.     On August 24, 2017, an Artemus-affiliated account held at City National Bank received approximately $10 million from Lucky Mark (HK) Trading Limited.  On October 10, 2017, a check for $1,782,052.13 in funds traceable to the funds wired to the Artmeus account on August 24, 2017, was

---

[4] INDIVIDUAL NO. 1 has alleged that his company was the victim of a cyber hacking incident, and that the hackers released certain stolen emails to the media, including the August 7, 2017, email.  Likewise, INDIVIDUAL NO.1 has alleged that at least some of the stolen emails were manipulated and/or fabricated by the hackers.

deposited into an account at Morgan Stanley in the name of Artemus.  On November 29, 2017, approximately $1,254,119 was transferred from that Artemus-affiliated account at Morgan Stanley to the ARTEMUS ACCOUNT at Wells Fargo.

### G.  MICHEL and HIGGINBOTHAM meet with JHO LOW in Macau

33.     Following this series of financial transactions, MICHEL and HIGGINBOTHAM traveled to Macau, China in early September 2017 to meet with JHO LOW.  Specifically, HIGGINBOTHAM and MICHEL met with JHO LOW in Macau to discuss ways to continue to funnel JHO LOW's money into U.S. financial institutions to pay those involved in the lobbying campaign, such as INDIVIDUAL NO. 1 and INDIVIDUAL NO. 2, to resolve DOJ's 1MDB investigation.  Because JHO LOW was concerned that U.S. banks would not allow him to transfer large sums of money in or through the United States financial system, MICHEL and JHO LOW agreed to disguise JHO LOW as the source of the funds and to use a cover story that would conceal from U.S. financial institutions JHO LOW's connection to these funds and, instead, claim that the funds were for entertainment purposes.  In truth, JHO LOW and MICHEL agreed that these funds would be used to pay those involved in the lobbying campaign to resolve the 1MDB matter on JHO LOW's behalf.  JHO LOW, however, insisted that some of the money actually go toward entertainment purposes, consistent with the "cover story."

### H.  Additional Transfers Into the ANICORN ACCOUNT and HIGGINBOTHAM's Accounts

34.     JHO LOW also came up with an idea to have HIGGINBOTHAM sign a power of attorney for an account in the name of Red Rock IX Limited, a corporate entity that exists in part to transfer JHO LOW's money.  HIGGINBOTHAM signed some documents to gain access to the Red Rock IX Limited bank account with a Chinese state-owned bank, but he was never successful in obtaining access to the assets in that bank account.

35.    Later that month, on September 17, 2017, INDIVIDUAL NO. 1 forwarded to INDIVIDUAL NO. 2 an email with wire instructions for an account associated with INDIVIDUAL NO. 1's wife, and wrote, "Here you go."   INDIVIDUAL NO. 2 responded, "Got it.   Fingers crossed[.]"  INDIVIDUAL NO. 1 responded, "Thank you."   INDIVIDUAL NO. 2 followed up with INDIVIDUAL NO. 1 later that same day, "Please send over for Pras a w9[.]   From entity u deem appropriate."  INDIVIDUAL NO. 1 responded, "Not sure W9 applies to corporations[.]   Let me check."   Later that same day, INDIVIDUAL NO. 1 and INDIVIDUAL NO. 2 received an email from INDIVIDUAL NO. 3 who wrote, "[INDIVIDUAL NO. 1] [,] Attached is the executed W-9 for [CORPORATION NO. 2]. Please contact me if you have need any [sic] additional information."   Attached to the email was a W-9 form for an entity named [CORPORATION NO. 2] executed that same day.   INDIVIDUAL NO. 1 responded, "Thank you [INDIVIDUAL NO. 3]."

36.    On September 20, 2017, the ANICORN ACCOUNT received a wire transfer from Lucky Mark (HK) Trading Limited for approximately $30 million.   A document dated September 13, 2017 purports to be a loan agreement between Lucky Mark and Anicorn apparently related to the $30 million wire.   The agreement noted that Anicorn was "in the business of International and Domestic Political Advocacy, Crisis Management, Press and Media Consulting globally," and that Lucky Mark was "interested in considering an investment in" Anicorn.   The agreement stipulated that Lucky Mark would "loan" 25 million Euros (approximately $30 million) to Anicorn "for the purposes of working capital and/or general corporate purposes of [Anicorn] and/or its subsidiaries or associated companies."   The agreement appears to be signed by an associate of JHO LOW on behalf of Lucky Mark, and by HIGGINBOTHAM on behalf of Anicorn.   The purpose of the loan agreement was to conceal JHO LOW's involvement in the transaction and provide a cover story in the event banks or other regulators made inquiries about the source and purpose of the funds.

37.    No additional transactions occurred following Anicorn's receipt of the approximately $30 million dollars because City National Bank ended its relationship with Anicorn and Artemus on or about September 29, 2017, and issued cashier's checks to MICHEL for the remaining balances (totaling approximately $37 million).

38.    Around this time, MICHEL contacted HIGGINBOTHAM and told him that a certain amount of money needed to come into the United States and be verifiable to those involved in the lobbying campaign before moving forward. MICHEL asked where the money could be sent, and HIGGINBOTHAM offered to have the money deposited into his attorney escrow account (the HIGGINBOTHAM 1078 ACCOUNT) at Citibank in the District of Columbia.

39.    On or about October 23, 2017, HIGGINBOTHAM received a wire transfer for approximately $41 million to the HIGGINBOTHAM 1078 ACCOUNT from an entity in Hong Kong called Red Rock IX Limited. He subsequently transferred $25 million of those funds into the HIGGINBOTHAM 9974 ACCOUNT, another Citibank account in the District of Columbia.

## II.    False Statements Made to City National Bank Regarding the ANICORN ACCOUNT

40.    As referenced above, the ANICORN ACCOUNT was one of the principal accounts used to receive payments from JHO LOW. The ANICORN ACCOUNT was originally opened in City National Bank in Los Angeles, California. It received multiple wire transfers totaling tens of millions of dollars from a Hong Kong bank account held at Industrial and Commercial Bank of China, in the name of Lucky Mark (HK) Trading Limited. On September 20, 2017, the ANICORN ACCOUNT received a wire transfer from Lucky Mark (HK) Trading Limited for approximately $30 million in additional funds.

41.    On July 21, 2017, City National Bank requested information from INDIVIDUAL NO. 4, a representative of Anicorn, about the nature of the company and the purpose of the payments from Lucky

Mark (HK) Trading Limited. INDIVIDUAL NO. 4 forwarded the request to HIGGINBOTHAM, asking him to call to discuss after he had reviewed the request.

42. On September 19, 2017, City National Bank requested additional documents and information related to the Anicorn/Lucky Mark transactions. This time, HIGGINBOTHAM responded directly with a letter on letterhead from "Higginbotham Law, P.C.," a legal entity formed by HIGGINBOTHAM in the District of Columbia. In this letter, HIGGINBOTHAM stated that he "represent[s] Mr. Pras Michel," and explained that Lucky Mark (HK) Trading Limited is a souvenir, gift, or novelty company and had retained Anicorn to identify counsel and other professionals to resolve "a highly complex civil litigation matter." HIGGINBOTHAM provided the bank a certificate of incorporation showing that Lucky Mark (HK) Trading Limited was incorporated in Hong Kong in July 2016, and claiming that "Lucky Mark is a souvenirs, gifts and novelty manufacturer and exporter." HIGGINBOTHAM did not mention to City National Bank the 1MDB civil forfeiture proceedings discussed above, or MICHEL's intent to use the funds in these accounts to assist JHO LOW. Nor was JHO LOW's connection with the funds deposited into the ANICORN ACCOUNT disclosed to City National Bank.

43. The statement of HIGGINBOTHAM to City National Bank about the Anicorn funds was false. Lucky Mark (HK) Trading Limited is not a souvenir or gift or novelty company. Nor was Lucky Mark International (HK) Limited the true source of the wire transfers to Anicorn. The company that transferred the funds to Anicorn—namely, Lucky Mark (HK) Trading Limited—was formed in 2016, and appears to be affiliated with JHO LOW, and does not appear to carry on any legitimate business.

## III. False Statements Made to Morgan Stanley Regarding the ANICORN and ARTEMUS ACCOUNTS

44. On or about September 29, 2017, City National Bank terminated its relationship with Anicorn and Artemus, and provided MICHEL with bank checks reflecting the balance of the accounts at

the time they were closed.  Shortly thereafter, these checks were provided to Morgan Stanley to open investment management accounts in Anicorn's and Artemus's names, in which HIGGINBOTHAM was listed as one of two account managers.

45.     Shortly after the Anicorn and Artemus funds were moved to Morgan Stanley, and in connection with the opening of accounts in the names of Anicorn and Artemus at Morgan Stanley, HIGGINBOTHAM met with a Morgan Stanley employee in the District of Columbia to discuss the opening of these accounts.  HIGGINBOTHAM and MICHEL also participated in a conference call with a Morgan Stanley representative.   During the call, the Morgan Stanley representative asked HIGGINBOTHAM and MICHEL about the source and purpose of the funds that Anicorn and Artemus were attempting to use to open the accounts at Morgan Stanley.  In response to those questions, MICHEL told the representative that the funds were for media consulting purposes.  In addition, following additional inquiries from a Morgan Stanley representative about the source and purpose of the funds, HIGGINBOTHAM sent an email stating, in relevant part, that "the funds originated with Lucky Mark, LTD (incorporation documents attached) who is an investor in a slate of projects the [sic] are currently under review and subject to further discussion," and that "the funds represent a good faith deposit contemplating future investments." These statements were false and misleading, as the funds were not intended to be used principally for media consulting purposes or for investments.  Rather, the funds were principally intended to be disbursed to other third parties in the United States to advance JHO LOW's interests in having the 1MDB forfeiture litigation closed.

IV.     **False Statements Made to Citibank Regarding HIGGINBOTHAM's Attorney Escrow Account (the HIGGINBOTHAM 1078 ACCOUNT)**

46.     As referenced above, on or about October 23, 2017, HIGGINBOTHAM received a wire transfer for approximately $41 million to his attorney escrow account (the HIGGINBOTHAM 1078 ACCOUNT) from an entity in Hong Kong called Red Rock IX Limited.  Like the transfers from Lucky

Mark (HK) Trading Limited, this $41 million transfer from Red Rock IX Limited was a means to funnel money under JHO LOW's control into the United States while disguising the nature and source of this money, including, specifically, JHO LOW's connection to the funds.

47. HIGGINBOTHAM, while in the District of Columbia, made false statements to Citibank in his verbal responses to questions that he was asked by a Citibank representative in connection with the transfer of the $41 million into his account from Red Rock. Specifically, HIGGINBOTHAM told Citibank that those funds were a corporate investment for a media consulting venture. This statement was false, as the funds had come from JHO LOW and were not to be used for a media consulting venture. Rather, the funds were to be disbursed to other third parties in the United States to advance JHO LOW's interests.

48. In sum, the opening of the Anicorn and Artemus accounts, the transfer of money from Lucky Mark (HK) Trading Limited into these accounts, and the transfer of money from Red Rock IX Limited into HIGGINBOTHAM's attorney escrow account were all part of a scheme to defraud U.S. financial institutions by funneling JHO LOW's money into the United States, so that this money could be further transferred and disbursed to other third parties in the United States to advance, among other things, JHO LOW's interests. MICHEL, HIGGINBOTHAM, JHO LOW, and others disguised the fact that the funds came from JHO LOW because they believed no U.S. bank would accept JHO LOW's money in light of the publicly-filed civil forfeiture actions in the Central District of California and the announced pending criminal investigation. MICHEL knew that JHO LOW was toxic to U.S. banks and that U.S. banks did not want to deal with him or accept JHO LOW's funds. HIGGINBOTHAM, MICHEL, and JHO LOW used the aforementioned accounts and companies to disguise the true source, origin, and purpose of the funds and, specifically, to conceal from U.S. financial institutions JHO LOW's ownership, control, and affiliation with these funds and transactions. Likewise, HIGGINBOTHAM and MICHEL

caused false statements to be made to City National Bank, Morgan Stanley, and Citibank to conceal JHO LOW's connection with these funds and transactions, conceal the purpose of these transactions, and effectuate the overall scheme.

### COUNT ONE

49.     The United States incorporates by reference the allegations set forth in paragraphs 3 through 48 as if fully set forth herein.

50.     The Defendant Properties are property that constitutes, and are derived from, proceeds traceable to one or more instances of bank fraud, in violation of Title 18, United States Code, Section 1344; conspiracy to commit bank fraud, in violation of Title 18, United States Code, Section 371; and false statements to a financial institution, in violation of Title 18, United States Code, Section 1014, each of which is a specified unlawful activity as defined in Title 18, United States Code, Sections 1956(c)(7)(A), 1956(c)(7)(B)(iv), and/or 1956(c)(7)(D), and a conspiracy to commit such offenses.

51.     As such, the Defendant Properties are subject to forfeiture to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C).

### COUNT TWO

52.     The United States incorporates by reference the allegations set forth in paragraphs 3 through 48 as if fully set forth herein.

53.     The Defendant Properties were involved in, and are traceable to property involved in, one or more transactions or attempted transactions in violation of Title 18, United States Code, Section 1957, and a conspiracy to commit such offenses, in violation of Title 18, United States Code, Section 1956(h). Specifically, the Defendant Properties were involved in and are traceable to property involved in one or more financial transactions, attempted transactions, and a conspiracy to conduct or attempt to conduct

such transactions in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activities, namely: bank fraud, in violation of Title 18, United States Code, Section 1344; conspiracy to commit bank fraud, in violation of Title 18, United States Code, Section 371; and false statements to a financial institution, in violation of Title 18, United States Code, Section 1014.

54.    As such, the Defendant Properties are subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(A).

## COUNT THREE

55.    The United States incorporates by reference the allegations set forth in paragraphs 3 through 48 as if fully set forth herein.

56.    The Defendant Properties were involved in, and are traceable to property involved in, one or more transactions or attempted transactions in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i), and a conspiracy to commit such offenses, in violation of Title 18, United States Code, Section 1956(h).  Specifically, the Defendant Properties were involved in, and are traceable to property involved in, one or more financial transactions or attempted transactions, and a conspiracy to conduct or attempt to conduct such transactions involving the proceeds of specified unlawful activity, namely: bank fraud, in violation of Title 18, United States Code, Section 1344; conspiracy to commit bank fraud, in violation of Title 18, United States Code, Section 371; and false statements to a financial institution, in violation of Title 18, United States Code, Section 1014, and were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of the specified unlawful activities, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

57.    As such, the Defendant Properties are subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(A).

## COUNT FOUR

58.     The United States incorporates by reference the allegations set forth in paragraphs 3 through 48 as if fully set forth herein.

59.     The Defendant Properties were involved in, and are traceable to property involved in, one or more transactions or attempted transactions in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i), and a conspiracy to commit such offenses, in violation of Title 18, United States Code, Section 1956(h).  Specifically, the Defendant Properties were involved in, and are traceable to funds that were, and were attempted to be, transported, transmitted, or transferred, and a conspiracy to transport, transmit, or transfer to a place in the United States from or through a place outside the United States, with the knowledge that the funds involved in the transportation, transmission, or transfer represented the proceeds of some form of unlawful activity, and knowledge that such transportation, transmission, or transfer was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activities, namely: bank fraud, in violation of Title 18, United States Code, Section 1344; and false statements to a financial institution, in violation of Title 18, United States Code, Section 1014.

60.     As such, the Defendant Properties are subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(A).

***

## **PRAYER FOR RELIEF**

WHEREFORE, the United States of America requests as follows:

A.      that notice issue on the Defendant Proprieties as described above;

B.      that due notice be given to all parties to appear and show cause why the forfeiture should
not be decreed;

C.      that a warrant of arrest *in rem* issue according to law;

D.      that judgment be entered declaring that the Defendant Funds be forfeited to the United
States of America for disposition according to law;

E.      that the United States of America be granted such other relief as this Court may deem just
and proper, together with the costs and disbursements of this action.

Dated: November 30, 2018
Washington, D.C.

Respectfully submitted,

DEBORAH CONNOR
Chief, Money Laundering &
        Asset Recovery Section


*/s/ Joshua L. Sohn*
Woo S. Lee, DC Bar No. 486004
Deputy Chief
Joshua L. Sohn, CA Bar No. 250105
Trial Attorney
Rebecca A. Caruso, VA Bar No. 90613
Trial Attorney
Money Laundering & Asset Recovery Section
1400 New York Avenue, N.W., 10th Floor
Washington, D.C. 20005
(202) 514-1263

Counsel for Plaintiff, United States

## **VERIFICATION**

I, Robert B. Heuchling, a Special Agent with the Federal Bureau of Investigation, declare under penalty of perjury, pursuant to Title 28, United States Code, Section 1746, that the foregoing Verified Complaint for Forfeiture *In Rem* is based upon reports and information known to me and/or furnished to me by other law enforcement agents and that everything represented herein is true and correct.

Executed on this <u>30th</u> day of November 2018.

Robert B. Heuchling, Special Agent,
International Corruption Unit
Federal Bureau of Investigation