**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Civil Action No. 18-cv-2795-CKK |
| v. | |
| $37,564,565.25 in ACCOUNT NUMBER XXXXXXXX9515 AT MORGAN STANLEY, IN THE NAME OF ANICORN LLC, | **Oral Hearing Requested** |
| $21,113.21 in ACCOUNT NUMBER XXXXXX9537 AT WELLS FARGO, N.A., IN THE NAME OF ARTEMUS GROUP, LLC, | |
| $25,002,568.63 in ACCOUNT NUMBER XXXXXX1078 AT CITIBANK, IN THE NAME OF HIGGINBOTHAM LAW P.C., and | |
| $11,314,205.00 in ACCOUNT NUMBER XXXXXX9974 AT CITIBANK, IN THE NAME OF HIGGINBOTHAM LAW P.C., | |
| Defendants *in rem*. | |

**CLAIMANTS' REPLY TO THE
GOVERNMENT'S OPPOSITION TO CLAIMANTS'
MOTION TO DISMISS THE COMPLAINT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 3

    I.    The Complaint does not adequately allege the commission of any specified unlawful activity or the existence of a conspiracy ............................................ 3

        A.    The Complaint fails to state the offense of bank fraud.......................................... 3

        B.    The Complaint does not state the offense of making false statements to a financial institution ............................................................................. 11

            1.    The complaint does not adequately allege false statements. ...................... 11

            2.    The alleged false statements were not made to influence any decision falling within Section 1014's scope. .......................................... 15

        C.    The Complaint fails to state the offense of conspiracy to commit bank fraud or to make false statements to a financial institution............................................ 17

    II.    The Claimed Accounts are not alleged to be proceeds of the alleged offense conduct. ............................................................................................ 19

CONCLUSION................................................................................................................ 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Bangor Hydro-Elec. Co. v. FERC*,
    78 F.3d 659 (D.C. Cir. 1996) ................................................................................17

*FDIC v. Meyer*,
    510 U.S. 471 (1994) ............................................................................................20

*FTC v. Mandel Bros., Inc.*,
    359 U.S. 385 (1959) ............................................................................................16

*Gutierrez v. Ada*,
    528 U.S. 250 (2000) ............................................................................................16

*INS v. National Ctr. for Immigrants' Rights, Inc.*,
    502 U.S. 183 (1991) ............................................................................................16

*Jarecki v. G. D. Searle & Co.*,
    367 U.S. 303 (1961) ............................................................................................16

*Jefferson v. Collins*,
    905 F. Supp. 2d 269 (D.D.C. 2012) ...................................................................12

*Loughrin v. United States*,
    573 U.S. 351 (2014) ...........................................................................................1, 9

*Mead Corp. v. Tilley*,
    490 U.S. 714 (1989) ............................................................................................16

*Robinson v. United States*,
    345 F.2d 1007 (10th Cir. 1965) .........................................................................13

*Shaw v. United States*,
    137 S. Ct. 462 (2016) ...............................................................................1, 3, 6, 8

*Theron v. United States Marshal*,
    832 F.2d 492 (9th Cir. 1987) .............................................................................13

*United States v. All Assets Held at Bank Julius Baer & Co.*,
    571 F. Supp. 2d 1 (D.D.C. 2008) .......................................................................14

*United States v. Autuori*,
    212 F.3d 105 (2d Cir. 2000) ...............................................................................12

# TABLE OF AUTHORITIES – Cont'd

**Page(s)**

*United States v. Brandon*,
298 F.3d 307 (4th Cir. 2002) ...............................................................6, 7

*United States v. Cassiere*,
4 F.3d 1006 (1st Cir. 1993)......................................................................12

*United States v. Devoll*,
39 F.3d 575 (5th Cir. 1994) ......................................................................17

*United States v. Heine*,
No. 3:15-cr-238-SI, 2018 WL 2567762 (D. Or. June 4, 2018).................4

*United States v. Krown*,
675 F.2d 46 (2d Cir. 1982)........................................................................17

*United States v. Kurlemann*,
736 F.3d 439 (6th Cir. 2013) ....................................................................12

*United States v. Lewis*,
67 F.3d 225 (9th Cir. 1995) ......................................................................11

*United States v. McNeil*,
320 F.3d 1034 (9th Cir. 2003) ............................................................10, 11

*United States v. Morganfield*,
501 F.3d 453 (5th Cir. 2007) ....................................................................10

*United States v. O'Brien*,
No. 17 CR 239-1, 2018 WL 4205472 (N.D. Ill. Sept. 4, 2018).................6

*United States v. Oakar*,
111 F.3d 146 (D.C. Cir. 1997)...................................................................17

*United States v. One Gulfstream G-V Jet Aircraft*,
941 F. Supp. 2d 1 (D.D.C. 2013) ..............................................................18

*United States v. Rapoport*,
545 F.2d 802 (2d Cir. 1976)......................................................................13

*United States v. Roen*,
499 F. App'x 583 (2013) ...........................................................................10

*United States v. Rowe*,
56 F.2d 747 (2d Cir. 1932)......................................................................3, 6

# TABLE OF AUTHORITIES – Cont'd

**Page(s)**

*United States v. Stephens*,
779 F.2d 232 (5th Cir. 1985) ................................................................13

*United States v. Sturman*,
No. 96 CR. 318 (BSJ), 1998 WL 524906 (S.D.N.Y. Aug. 20, 1998) ..............................12, 13

*United States v. Walsh*,
119 F.3d 115 (2d Cir. 1997)................................................................13

*United States v. Williams*,
865 F.3d 1302 (10th Cir. 2017) ................................................................6

*United States v. Wynn*,
61 F.3d 921 (D.C. Cir. 1995) ................................................................17

*United States v. Zarrab*,
No. 15 Cr 867 (RMB), 2016 WL 6820737 (S.D.N.Y. Oct. 17, 2016)............................7, 8, 21

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
136 S. Ct. 1989 (2016) ................................................................21

*Williams v. United States*,
458 U.S. 279 (1982) ................................................................17

**Statutes and Regulations:**

18 U.S.C. § 981(a)(1)(A) ................................................................21

18 U.S.C. § 981(a)(1)(C) ................................................................18

18 U.S.C. § 981(a)(2)(A) ................................................................2, 5, 19, 20

18 U.S.C. § 1014 ................................................................1, 12, 16

18 U.S.C. § 1344 ................................................................1

18 U.S.C. § 1344(1) ................................................................3

18 U.S.C. § 1344(2) ................................................................8, 9

18 U.S.C. § 1956 ................................................................21

18 U.S.C. § 1956(a)(1) ................................................................21

18 U.S.C. § 1956(c)(7)................................................................18

## TABLE OF AUTHORITIES – Cont'd

**Page(s)**

International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1706 ...................................7

Iranian Transactions and Sanctions Regulations, 31 C.F.R. §§ 560.202-205 ................................7

**Other Authorities:**

H.R. Rep. No. 91-1556 (1970).........................................................................................................17

## INTRODUCTION

The Government's Complaint seeks to divest Claimants of their ownership of and possessory interest in the two Claimed Accounts on the theory that the roughly $37.6 million held there are the proceeds of bank fraud (in violation of 18 U.S.C. § 1344) and making false statements to a financial institution (in violation of 18 U.S.C. § 1014).  At every turn, the Government seeks to expand forfeiture liability beyond all recognized limits.

According to the Government, for example, an alleged scheme to induce banks (here, City National Bank and Morgan Stanley) to accept deposits, standing alone, constitutes bank fraud. The Government's theory turns the concept of bank fraud upside down.  As the Supreme Court has explained, a bank fraud offense requires a scheme to "deprive [a bank] of something of value," *Shaw v. United States*, 137 S. Ct. 462, 469 (2016), or to "obtain[] bank property" through false representations, *Loughrin v. United States*, 573 U.S. 351, 356 (2014).  In an effort to escape the conclusion that depositing money does not deprive the bank of property, the Government is forced to rely on supposition about how the banks may theoretically have been deprived of property, such as interest payments.  Such supposition, however, is not supported by any factual allegations in the Complaint; nor even if it were, would it lead to the conclusion that the money deposited, as opposed to the interest earned on that money, would be subject to forfeiture.

As for the Complaint's false statements theory, the Government argues that Michel's and Higginbotham's alleged statements to City National Bank and Morgan Stanley were falsehoods primarily because those statements allegedly omitted material information regarding the source of funds deposited with those banks.  But Section 1014 does not reach statements that are allegedly

misleading by omission, and in any event, the Government does not identify any legal duty to supply the allegedly omitted information.[1]

Moreover, the Government errs in attempting to expand Section 1014's reach beyond banks' lending transactions (and other transactions that involve the use of assets of financial institutions). The Government advances no sound basis for evading that limitation in the applicability of Section 1014, which is apparent from Section 1014's text and has been recognized by the Supreme Court.

Finally, the Government's Opposition is unable to establish that the Complaint alleges that the funds held in the Claimed Accounts are traceable to proceeds of either the alleged bank fraud or the alleged offense of making false statements to a financial institution. Contrary to the Government's assertion, Claimants' argument does not rely on any distinction between the net profits and gross receipts of unlawful activity. Rather, the Complaint's allegations are insufficient because they do not establish that the funds held in the Claimed Accounts were "obtained . . . as the result" of the alleged offense conduct. 18 U.S.C. § 981(a)(2)(A). Put simply, the scheme alleged in the Complaint to "funnel[]" funds from one bank account to another (Complaint ¶ 48) does not generate criminal proceeds. The Government cannot escape that conclusion through its implausible and unprecedented argument that depositing funds with a bank in the United States somehow transforms them into a new and distinct form of property subject to forfeiture. However, even if the Government's argument about the transformation of property when it is introduced into the United States banking system were correct, the Government's argument nonetheless fails

---

[1] Although the Government also contends that one statement made by Higginbotham to City National Bank was affirmatively false because what he said was true not about the entity that was the source of funds being deposited, but rather about a different entity with a similar name, the Complaint fails to allege that Higginbotham knew that his statement referred to the wrong entity.

because the Complaint alleges that Claimants had already introduced the funds into the United States before depositing them with City National Bank and Morgan Stanley.  The alleged scheme to defraud and make false statements to City National Bank and Morgan Stanley merely caused them to accept for deposit funds already in the United States; it did not result in any criminal proceeds that can be subjected to forfeiture.

For all of these reasons, the Complaint should be dismissed as to the Claimed Accounts for failure to state a claim upon which relief can be granted.[2]

## ARGUMENT

I.    **The Complaint does not adequately allege the commission of any specified unlawful activity or the existence of a conspiracy.**

A.    **The Complaint fails to state the offense of bank fraud**.

1. As explained in Claimants' opening brief (at 8-9), the Complaint fails to state a bank fraud offense under 18 U.S.C. § 1344(1), because it alleges a scheme to induce banks to *receive* money linked to  Low, rather than a scheme to "deprive [a bank] of something of value." *Shaw v. United States*, 137 S. Ct. 462, 469 (2016); see also *id.* at 467 (bank must be "induced to part with" use of its property by means of a fraudulent scheme) (quoting *United States v. Rowe*, 56 F.2d 747, 749 (2d Cir. 1932)).  Without disputing that a scheme to deprive a bank of "something of value" is a required element under Section 1344(1), the Government's Opposition advances three strained arguments in an attempt to satisfy this element.  Each of these arguments lacks merit.

---

[2] The Government does not dispute Claimants' argument that each of the Complaint's forfeiture counts ultimately rests on the premise that the funds held in the Claimed Accounts are traceable to "specified unlawful activity," in the form of either bank fraud or making false statements to financial institutions.  See Claimants' Opening Br. 15-16.  Accordingly, as set forth in Claimants' opening brief, if Count One of the Complaint is dismissed, then each of the remaining counts must be dismissed as well.

*First*, the Government contends (Opp. 4) that opening bank accounts allowed Michel and Higginbotham to obtain a "menu of account services from the banks," and that those services qualify as "something of value." As an initial matter, that theory finds no support in the Complaint. As the Government obliquely acknowledges (Opp. 4 n.2), the Complaint does not allege what services, if any, were offered in connection with the accounts that Michel and Higginbotham opened, much less that Michel and Higginbotham intended to deprive the banks of any such (unspecified) services. To the contrary, the Complaint is crystal clear that the object of the alleged scheme was to "funnel[]" money into the United States. Complaint ¶ 48.

Moreover, and in any event, the Government's expansive conception of the "something of value" requirement also lacks support in precedent. The sole case the Government cites, *United States v. Heine*, No. 3:15-cr-238-SI, 2018 WL 2567762 (D. Or. June 4, 2018), is inapt. That unpublished decision involved a pair of bank executives who conspired to conceal information regarding the bank's financial condition from the bank's board, its shareholders, and its regulators. *Id.* at *1. In rejecting the defendants' sufficiency challenge, the court held that their scheme had deprived the bank of "something of value" because it had allowed them to "continue to receive their salaries, bonuses, and favorable access to the Bank's lending services." *Id.* at *4. To state the obvious, depriving a bank of salaries and bonuses is the deprivation of money—a form of property that is a prototypical object of conventional bank fraud schemes. And although the Government relies on the *Heine* court's reference to "lending services," that is just another way of saying that the defendants were able to obtain loans from the bank on favorable terms due to their continued employment, which they maintained through fraudulent concealment of the bank's financial condition. Again, that is an entirely conventional bank fraud scheme, where the defendants were to receive money from a bank in the form of loan proceeds. The facts alleged in

*Heine* stand in stark contrast to the Government's unsupported contention in this case that Section 1344(1) can be violated through a scheme to obtain unspecified "account services" from a bank.

Finally, even if the Government could otherwise prevail on a theory that the defendants engage in a scheme to defraud the banks of "account services," that would not entitle the Government to the forfeiture of the deposited funds. The deposited funds are not the proceeds of a scheme to deprive the bank of "account services." Rather, the Government would merely be entitled to the forfeiture of the "account services" themselves.

*Second*, the Government contends (Opp. 4) that the banks were induced to make interest payments on deposited funds, and that such payments would constitute "something of value." As an initial matter, that contention is also untethered to the allegations of the Government's Complaint: The Complaint does not allege that Michel and Higginbotham opened interest-bearing accounts (see Gov't Opp. 4 n.2), and it certainly does not allege that they engaged in a scheme to deprive the banks of interest payments. See Complaint ¶ 48.

More importantly, however, the Government's reliance on any (unalleged and hypothetical) interest payments cannot possibly support the Government's bottom-line conclusion that all of the funds held in the Claimed Accounts are subject to forfeiture. Even assuming, contrary to allegations in the Complaint, that Michel and Higginbotham had engaged in a fraudulent scheme to deprive the banks of interest payments, the proceeds of such a scheme would be those interest payments and any funds traceable to them. The Government does not identify any basis in precedent or logic for treating the *entirety* of the Claimed Accounts as proceeds of a scheme to receive interest payments. See 18 U.S.C. § 981(a)(2)(A) (defining "proceeds" to mean "property of any kind obtained directly or indirectly, *as the result of the commission of the offense*

giving rise to forfeiture, and any property traceable thereto") (emphasis added); see also pp. 19-22, *infra*.

*Third*, the Government contends (Opp. 4-5) that the Complaint states an offense under Section 1344(1) because inducing banks to accept Low's money exposed the banks to potential civil liability and government penalties, which in turns qualifies as a risk of losing "something of value." The Government is mistaken, however, in contending (Opp. 4) that "numerous" cases treat the possibility of civil liability as sufficient to establish a violation of Section 1344(1) in a case that does not involve a bank being "induced to part with" use of its property by means of a fraudulent scheme. *Shaw*, 137 S. Ct. at 467 (quoting *Rowe*, 56 F.2d at 749).

In fact, three of the four cases cited by the Government involved conventional fraud schemes where defendants obtained bank funds by fraudulent means. In *United States v. Williams*, 865 F.3d 1302 (10th Cir. 2017), for instance, the defendant had misrepresented his qualifications to the bank in order to obtain a mortgage loan. *Id.* at 1306-07. That is a scheme to obtain something of value—loan proceeds—from the bank. The court separately held that the bank was exposed to a risk of loss, because the lies had some potential to cause the bank to loan more than the defendant could reasonably borrow. *Id.* at 1318-19. Critically, the court treated "risk of loss" as an *additional* requirement beyond the requirement that the defendant "intend[] to deceive others to obtain something of value," not as a substitute for that requirement. *Id.* at 1309.

Likewise, the defendant in *United States v. O'Brien*, No. 17 CR 239-1, 2018 WL 4205472 (N.D. Ill. Sept. 4, 2018), fraudulently obtained mortgage proceeds by making false statements regarding borrowers' qualifications. *Id.* at *2, *13. On the facts of the case, there was no conceivable dispute that the defendant's conduct had deprived the bank of "something of value." And the same was true in *United States v. Brandon*, 298 F.3d 307 (4th Cir. 2002), where the

defendants' scheme involved stealing bank customers' blank checks, procuring picture identification for those customers, forging their signatures, and then negotiating the forged checks for payment. *Id.* at 309. That, too, is conventional bank fraud: Although the checks were not presented directly to the bank, the scheme was one to defraud a bank because the intended result was to deprive the banks of the funds released on account of the forged checks. *Id.* at 312.

Thus, the only authority that provides even minimal support for the Government's position is the district court's unpublished decision in *United States v. Zarrab*, No. 15 Cr 867 (RMB), 2016 WL 6820737 (S.D.N.Y. Oct. 17, 2016). There, the defendant was accused of structuring international financial transactions to evade sanctions imposed on Iran, through the use of a series of shell entities to conceal the transactions' connections with sanctioned entities. *Id.* at *1, *11. The court held that the indictment adequately stated a conspiracy to commit bank fraud. *Id.* at *12. Although the defendant's conduct did not involve withdrawing assets from the bank in excess of what he had deposited, the court reasoned that the bank was nonetheless exposed to a risk of loss because it faced the prospect of "massive fines and forfeiture" if it were to execute forbidden transactions. *Id.* at *14.

The Government contends (Opp. 5-6) that the same rationale demonstrates that Michel's and Higginbotham's conduct exposed the banks to a risk of loss, and thus deprived them of "something of value." But even if correctly decided, *Zarrab* addressed an entirely different situation. There, the court held that the bank transactions at issue violated federal law, in the form of the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1706, and the Iranian Transactions and Sanctions Regulations, 31 C.F.R. §§ 560.202-205. *See* 2016 WL 6820737, at *6. Here, by contrast, the Complaint alleges that banks in the United States perceived Low as "toxic" and wished to avoid doing business with him (Complaint ¶ 48), but it does not allege that

the banks would have violated any law by accepting deposits from him.  Thus, there is no basis in the Complaint for the Government's supposition that doing business with Low would have subjected the banks to a risk of regulatory penalties.

In any event, *Zarrab* is unpersuasive on its own terms.  The court failed to identify any precedent supporting its novel expansion of the bank fraud statute to a case that did not involve any effort to induce a bank to "part with" its own property, *Shaw*, 137 S. Ct. at 467, and the only threat to the bank's property came from a hypothetical regulatory response.  Nor is there any basis in logic for the notion, echoed by the Government here (Opp. 5-6), that a bank would face a meaningful risk of fines or forfeiture if it were to participate *unwittingly* in a barred transaction.  Here, even if the Government were correct that knowingly doing business with Low was somehow illegal, the Government's allegation is that the banks were "duped" (Opp. 5) into accepting deposits that originated with him.  Under the Government's view, the banks were a *victim* of a fraudulent scheme, and regulators would accordingly have no basis to target them for enforcement action.  As a consequence, the Government's "risk of loss" theory is insufficient to establish a bank fraud offense.

2.  The Government separately contends (Opp. 6-7) that the Complaint alleges bank fraud under 18 U.S.C. § 1344(2), which criminalizes the knowing execution of a scheme or artifice "to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises."  Equating a bank "credit" with a bank deposit, the Government reasons that Michel and Higginbotham obtained "credits" from the banks, within the meaning of Section 1344(2), by inducing them to accept deposits that they otherwise would not have chosen to accept.

The Government's argument is incorrect, however, because it focuses exclusively on Section 1344(2)'s reference to "credits" while overlooking the important limitations imposed by the remainder of that provision.  A "credit" corresponding to a bank customer's deposit account cannot plausibly be described as being property "owned by, or under the custody or control of, a financial institution."  18 U.S.C. § 1344(2).  As the Government acknowledges (Opp. 6), a "credit" corresponding to a customer's deposit is a *liability* from a bank's perspective.  It is the money deposited that is the property under the custody or control of the bank, not the corresponding liability.[3]

Claimants allegedly deposited their own property; they did not seek to deprive the banks of the banks' property.  Because, as the Supreme Court has explained, Section 1344(2) criminalizes schemes aimed at "obtaining bank property" through false representations, *Loughrin v. United States*, 573 U.S. 351, 356 (2014), inducing a bank to accept a deposit, and thereby create a corresponding liability to return the customer's property, is not an offense under the statute.[4]

---

[3] In other contexts, a credit can be an *asset* of a financial institution, and a scheme to defraud a financial institution of a credit that is an asset (as opposed to a liability) would violate Section 1344(2).  For example, if Financial Institution A deposits funds with or loans funds to Financial Institution B, Financial Institution A would have a credit with Financial Institution B.  If an individual fraudulently caused Financial Institution B to transfer the credit to him, the individual would have perpetrated a scheme to defraud Financial Institution A of its asset in violation of Section 1344(2), even though the individual could not be charged with a scheme to defraud Financial Institution B of its corresponding liability.

[4] Citing the Supreme Court's decision in *Loughrin*, 573 U.S. at 366 n.9, the Government observes that Section 1344(2) does not require proof that the defendant's scheme exposed a bank to a risk of financial loss.  See Gov't Opp. 6.  But the very passage cited by the Government makes clear that, while a risk of financial loss by a bank is unnecessary, the "property at issue" in the defendant's scheme must still be "'property owned by or under the custody or control of' a bank." *Loughrin*, 573 U.S. at 366 n.9 (quoting 18 U.S.C. § 1344(2)).  Section 1344(2) does not permit a fraud prosecution in a case that does not involve "obtaining bank property" through false representations. *Id.* at 356.

None of the cases cited by the Government supports its contention that Section 1344(2) may be violated by setting up a deposit account, without some further effort to obtain property from the bank by fraudulent means.    In *United States v. Morganfield*, 501 F.3d 453 (5th Cir. 2007), for example, setting up a deposit account was part of a broader scheme to obtain bank funds. There, the defendants schemed to establish commercial checking accounts in the name of fictious companies, which were then used to write and cash fraudulent checks to fake payees.  *Id.* at 456-57.   Because the amounts of the checks exceeded the value of the deposits used to open the accounts, *id.* at 457, the scheme was a straightforward one to obtain the bank's funds.   Although the court relied in part on misrepresentations made to the bank in the course of opening the accounts, that was to establish that the scheme involved false representations, as is required to establish liability under Section 1344(2).  See *id.* at 463.   The *Morganfield* court did not hold, as the Government urges here, that opening the deposit accounts was itself a violation of Section 1344(2) on the theory that the defendants thereby obtained "credits" from the bank.

The same is true of the Seventh Circuit's unpublished decision in *United States v. Roen*, 499 F. App'x 583 (2013).   There, as part of his scheme, the defendant had written a check for $300 on his new bank account, despite apparently having deposited no funds into the account.  *Id.* at 584.   That is a straightforward effort to obtain bank funds as to which the defendant had no lawful entitlement.   Moreover, the defendant appears to have challenged the Government's Section 1344(2) theory only on the ground that his false statements were not material.  See *id.* at 586.   The Seventh Circuit thus had no occasion to address the Government's current theory that simply opening a deposit account, without any effort to obtain bank property, can violate Section 1344(2).

Nor did the court address that theory in *United States v. McNeil*, 320 F.3d 1034 (9th Cir. 2003).   In that case, as the Government's brief before the Ninth Circuit observed, the defendant

did "not contest that he attempted to execute a scheme to obtain moneys, funds, credits or other property under the custody or control of a financial institution by means of false or fraudulent pretenses or representations."  Gov't C.A. Br. at 13, *McNeil*, *supra* (No. 02-30138), 2002 WL 32100106.  The Ninth Circuit addressed, and rejected, the defendant's arguments that the evidence was insufficient to convict him under Section 1344(2) on the grounds that he had not exposed a bank to a risk of loss and had not acted with the requisite intent.  See 320 F.3d at 1038-40.  But the Ninth Circuit did not hold that the defendant's false statements in opening a deposit account were themselves sufficient to violate Section 1344(2) on the theory that opening the account allowed him to obtain "credits" from the bank.

\* \* \*

The Complaint fails to allege any recognizable form of bank fraud because it does not identify any scheme to deprive a bank of "something of value" or to obtain bank property. At bottom, therefore, the Government's fraud allegations rely on a theory that the banks were deprived of "the right to make an informed business decision," *United States v. Lewis*, 67 F.3d 225, 233 (9th Cir. 1995), about whether to open deposit accounts for the Claimants.  Because that is precisely the sort of "intangible right" that the federal fraud statutes do *not* protect, *id.*, the Complaint fails to state a bank fraud offense.

**B.    The Complaint does not state the offense of making false statements to a financial institution**.

**1.    The complaint does not adequately allege false statements**.

The Government labors to establish that the Complaint adequately alleges that false statements were made to City National Bank and Morgan Stanley.  See Gov't Opp. 8-10.  Those efforts, however, are unpersuasive.

a.  The Government argues that Higginbotham's alleged statements to City National Bank were false because they did not "mention" 1MDB, the intent to use the funds to assist Low, or Low's connections to the funds or to Lucky Mark.  See Complaint ¶¶ 42-43.  According to the Government (Opp. 8), a material omission can constitute a false statement in violation of Section 1014.  But Section 1014 imposes liability only for "knowingly mak[ing] any false statement or report," 18 U.S.C. § 1014, which does not include statements that are misleading by omission.  See *United States v. Kurlemann*, 736 F.3d 439, 448 (6th Cir. 2013) (unanimous panel holding: "Congress did not proscribe concealment, half-truths or omissions in § 1014.").[5]

The Government's reliance on *United States v. Sturman*, No. 96 CR. 318 (BSJ), 1998 WL 524906 (S.D.N.Y. Aug. 20, 1998), is misplaced.  In that decision, which predated the Sixth Circuit's well-reasoned decision in *Kurlemann*, the district court suggested that "omissions can serve as the basis for a Section 1014 conviction."  But the *Sturman* decision was in the context of the defendant's submission of financial compilations that omitted certain loans despite "purport[ing] to disclose all known outstanding liabilities."  *Id.* at *1.  In that context, the defendant's incomplete enumeration of his debts was an affirmative misrepresentation of his total indebtedness.  In other words, in that context, the omission was not merely an omission, but also an affirmative misrepresentation.  *Sturman* does not call into question the later decision in

---

[5] Moreover, even under fraud statutes worded more broadly than Section 1014, an omission may be treated as equivalent to an affirmative misrepresentation only when the defendant is under a legal duty to disclose the omitted information.  See, *e.g.*, *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000); *United States v. Cassiere*, 4 F.3d 1006, 1023 (1st Cir. 1993); cf. *Jefferson v. Collins*, 905 F. Supp. 2d 269, 286 (D.D.C. 2012) (common law fraud claim).  The Government does not identify any conceivable source for such a legal duty here.

*Kurlemann* that Section 1014 does not reach concealment, half-truths, or omissions in the absence of an affirmative misrepresentation.[6]

Here, by contrast, the Complaint does not allege that Higginbotham's statements to City National Bank were made in response to any particular inquiry that would have called for the information that Higginbotham allegedly failed to "mention." Thus, the Government's omission theory cannot establish the misrepresentation required by Section 1014.

b. In addition to its theory that Higginbotham's statements to City National Bank were false by omission, the Government also contends (Opp. 8) that Higginbotham's statements to City National Bank were affirmatively false because he provided information that related not to Lucky Mark (HK) Trading Limited, the source of funds that were transferred to City National Bank, but rather, information related to Lucky Mark International (HK) Limited, a different entity in Hong Kong with a strikingly similar name. But the Complaint does not allege that Higginbotham knew that the information he was providing related to Lucky Mark International (HK) Limited, and was false as it pertains to Lucky Mark (HK) Trading Limited. Indeed, it does not even allege that Higginbotham knew they were different entities.

In its Opposition, the Government implicitly concedes this point. Rather than citing any factual allegation with specificity or particularity that appears in the Complaint, the Government

---

[6] The older, pre-*Kurlemann* decisions relied upon by the court in *Sturman* addressed similar situations. See *United States v. Walsh*, 119 F.3d 115, 117 (2d Cir. 1997) (omission of certain liabilities from home loan application); *United States v. Stephens*, 779 F.2d 232, 234 (5th Cir. 1985) (omission of certain liabilities from financial statements appended to loan application); *United States v. Rapoport*, 545 F.2d 802, 806-07 (2d Cir. 1976) (defendant caused applicants for Small Business Administration loans to omit finders' fees from loan applications that requested "full disclosure of the names of, and the amount of compensation being paid to, persons engaged to provide 'services of any nature whatever' in connection with the loan applications"); *Robinson v. United States*, 345 F.2d 1007, 1009-10 (10th Cir. 1965) (liabilities omitted from loan application); see also *Theron v. United States Marshal*, 832 F.2d 492, 497 (9th Cir. 1987) (restating *Robinson*'s holding in the context of an extradition dispute).

falls back on the Complaint's general allegation that Higginbotham and Michel caused false statements to be made "to conceal JHO LOW's connection with these funds and transactions, conceal the purpose of these transactions, and effectuate the overall scheme."  Complaint ¶ 48. But that sort of generalized allegation is plainly inadequate given the "heightened burden for pleading," *United States v. All Assets Held at Bank Julius Baer & Co.*, 571 F. Supp. 2d 1, 16 (D.D.C. 2008), that is imposed in forfeiture cases by Supplemental Rule G(2)(f).  See Claimants' Opening Br. 6.

      c.  With respect to Morgan Stanley, the Government lacks any meaningful response to Claimants' showing that the statements the Government argues to be false (*i.e.*, that funds would be used *principally* for media consulting or for investments) differ from the statements that the Complaint alleges were actually made (*i.e.*, that funds would be used for media consulting or for investments).  See Claimants' Opening Br. 11; Complaint ¶ 45.  The Government fails to explain how the Complaint can be read to allege an affirmative false representation despite this fundamental mismatch.

      Instead, the Government appears to contend (Opp. 10) that the statements to Morgan Stanley were false because Michel and Higginbotham allegedly failed to explain that, in addition to media consulting and investment purposes, the funds would also be used to support lobbying efforts on Low's behalf.  As we have explained above, however, Section 1014 covers only affirmative *false* statements, not statements that allegedly mislead by omission.  See p. 12, *supra*. In any event, even if Section 1014's proscription were to extend beyond affirmative false statements, such proscription could only extend to omissions where the party making the omission had a legal duty to disclose the omitted information.  The Government does not identify any such

legal duty to disclose that the funds would be used, in part, to support lobbying efforts on behalf of Low.

The Government's theory of falsity by omission with respect to Morgan Stanley thus fails for the same reasons set forth above with respect to City National Bank. Accordingly, the Complaint does not state an offense under Section 1014.

> **2.**     **The alleged false statements were not made to influence any decision falling within Section 1014's scope**.

As explained in Claimants' opening brief, Section 1014 applies only to false statements that are intended to influence a financial institution with respect to lending transactions or other similar transactions—*i.e.*, decisions of the financial institution to part with property. See Claimants' Opening Br. 12-13. Thus, a decision to accept or retain deposits does not fall within the ambit of the statute.

The Government contends (Opp. 10-13) that Section 1014 sweeps far more broadly. The Government argues (Opp. 10-11) that the alleged statements in this case were intended to influence the banks' "commitment" to accept deposited funds (both with respect to City National Bank and Morgan Stanley) and (in the case of Morgan Stanley) an "application" to open a deposit account. In the Government's view (Opp. 12-13), it is of no moment whether an "application" or "commitment" pertains in any way to a lending transaction or similar transaction involving disposition of the bank's property.

The Government's position implausibly expands Section 1014's scope. Under the Government's reading, it is hard to conceive of *any* decision by a bank that would not be covered by the statute; a bank's agreement to any proposal could always be described as a "commitment" to take the agreed upon action. If that were the result Congress intended, however, then it had a much more straightforward way of accomplishing it: Congress could simply have criminalized

any false statement made to influence "any decision" by a covered financial institution.   Instead, Congress chose to enumerate a list of the decisions it intended to cover.   See 18 U.S.C. § 1014 (referring to false statement made to influence action on "any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, loan, or insurance agreement or application for insurance or a guarantee").

"The maxim noscitur a sociis, that a word is known by the company it keeps," *Jarecki v. G. D. Searle & Co.*, 367 U.S. 303, 307 (1961), requires that these terms be interpreted according to their common characteristic.   The expression of one thing implies the exclusion of others (expressio unius est exclusio alterius).   Here, Congress plainly chose a list of transactions that involve the disposition of a financial institution's property.   That understanding is also supported by Section 1014's caption—"Loan and credit applications generally; renewals and discounts; crop insurance"—which makes clear that generic references to "application[s]" or "commitment[s]" must be construed in light of the surrounding statutory language.   See *INS v. National Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 189-90 (1991) (the title of a statute or section "can aid in resolving an ambiguity in the legislation's text") (citing *Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989); *FTC v. Mandel Bros., Inc.*, 359 U.S. 385, 388-89 (1959)).[7]

The Government observes (Opp. 12) that, while the D.C. Circuit has not reached the question, a majority of courts to have addressed the issue have held that Section 1014 extends beyond lending transactions.   As Claimants explained in their opening brief (at 13 n.7), however,

---

[7] The Government attributes dispositive significance to Section 1014's use of the word "any" before its enumeration of covered decisions.   See Gov't Opp. 12.   But a statute's use of the word "any" does not preclude application of the noscitur a sociis canon.   See, *e.g.*, *Gutierrez v. Ada*, 528 U.S. 250, 254-58 (2000) (applying the canon to narrow the relevant phrase, "any election," where it was surrounded by specific references to gubernatorial elections); *Jarecki*, 367 U.S. at 306-09 (applying the canon to narrow the term "discoveries" to discoveries of mineral resources where it was contained in a list of three words, all of which applied to the oil, gas, and mining industries).

other courts have reached the opposite conclusion.  See *United States v. Devoll*, 39 F.3d 575, 579 (5th Cir. 1994); *United States v. Krown*, 675 F.2d 46, 51 (2d Cir. 1982).  For the reasons explained above, the Second and Fifth Circuit's conclusions are consistent with the statutory text.   They also track the Supreme Court's recognition that Section 1014 criminalizes "making false statements or reports *in connection with loans or other similar transactions*."  *Williams v. United States*, 458 U.S. 279, 289-90 (1982) (emphasis added) (quoting H.R. Rep. No. 91-1556 at 35 (1970).  While the Government seeks to dismiss the Supreme Court's statement as dicta (Opp. 13), the D.C. Circuit has made clear that guidance from the Supreme Court may not be so readily set aside.  See, *e.g.*, *United States v. Oakar*, 111 F.3d 146, 153 (D.C. Cir. 1997); *Bangor Hydro-Elec. Co. v. FERC*, 78 F.3d 659, 662 (D.C. Cir. 1996).  Thus, Section 1014 must be read as limited to false statements that are intended to influence a lending transaction or other transaction that involves the disposition of a financial institution's property.[8]

### C.    The Complaint fails to state the offense of conspiracy to commit bank fraud or to make false statements to a financial institution.

As explained in Claimants' opening brief (at 14), the failure of the Complaint to state the offenses of bank fraud or false statements to a financial institution necessarily leads to the conclusion that the Complaint also fails to state a conspiracy, because conspiracy requires, among other things, "an agreement between two or more persons *to commit an offense*."   *United States*

---

[8] The Government glancingly suggests (Opp. 13-14) that the alleged false statements fall within Section 1014's scope even under Claimants' understanding of the statute.  The Government notes (Opp. 13) that, when a bank accepts a deposit, it is actually accepting a loan from the depositor. Thus, the Government reasons, the alleged false statements here were intended to induce the banks to accept loans from Claimants.  But, as explained above, Section 1014's evident focus is on transactions in which a financial institution parts with its own property.  A loan *to* a bank does not fall within that scope.

*v. Wynn*, 61 F.3d 921, 929 (D.C. Cir. 1995) (emphasis added).  The Government does not dispute that conclusion.

Separately, even if the conspiracy allegation could otherwise survive the motion to dismiss, the Government is incorrect in contending (Opp. 14-15) that the Complaint provides adequate allegations of the membership, timing, and nature of the alleged conspiracy.  The Government relies (Opp. 15) on paragraphs 7, 33, 36, and 48 of the Complaint.   Those paragraphs allege interactions between Michel, Higginbotham, Low, and others (see Complaint ¶¶ 7, 33, 36), and set forth the Government's basic theory that money tied to Low was brought into the United States as part of a scheme to defraud banks (Complaint ¶ 48).   But nothing in the cited paragraphs alleges when the agreement to defraud banks or to make false statements was allegedly entered into or by whom, how long the conspiracy lasted, or who the alleged participants in the conspiracy were.   Nor does the Complaint identify the objects of the conspiracy, its manner and means, or overt acts undertaken in furtherance of the conspiracy.  Indeed, neither the word "conspiracy" nor the word "conspired" appears in connection with any of the Claimants *anywhere* in the Complaints' factual allegations.   Under these circumstances, the Government has failed to meet its burden to "allege enough facts so that the claimant may understand the theory of forfeiture." *United States v. One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d 1, 14 (D.D.C. 2013); see Claimants' Opening Br. 13-14.[9]

---

[9] The Government overreads (Opp. 14) Claimants' opening brief as suggesting that conspiracy to commit bank fraud or conspiracy to make false statements to a financial institution cannot give rise to forfeiture under 18 U.S.C. § 981(a)(1)(C).  Claimants' point was a more limited one:  While bank fraud and making false statements to a financial institution are "specified unlawful activity" under 18 U.S.C. § 1956(c)(7), the statutory definition of specified unlawful activity does *not* include conspiracy to commit those offenses.  Thus, the portions of Counts One, Two, and Three that rely on allegations of conspiracy to commit bank fraud or conspiracy to make false statements to a financial institution *as specified unlawful activity* should be dismissed.  See Claimants' Opening Br. 13, 16 n.9.  The Government's Opposition does not dispute that point.

**II.      The Claimed Accounts are not alleged to be proceeds of the alleged offense conduct.**

The Complaint's forfeiture claims fail for the separate and independent reason that, even if the Complaint plausibly alleged the commission of bank fraud and false statements to a financial institution, or a conspiracy to commit these offenses, it fails to allege that the Claimed Accounts are proceeds traceable to the offenses alleged.  See Claimants' Opening Br. 14-15.  The Complaint alleges a scheme to "funnel[]" money from Low into the United States (Complaint ¶ 48) and alleges that Michel and Higginbotham made false statements to City National Bank and Morgan Stanley after those funds had been brought into the United States (Complaint ¶¶ 43, 45, 48). Because these alleged offenses did not generate any criminal proceeds at all, the funds in the Claimed Accounts cannot be described as "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto."  18 U.S.C. § 981(a)(2)(A).

Resisting this inevitable conclusion, the Government first observes (Opp. 15) that the statutory definition of proceeds "is not limited to the net gain or profit realized from the offense." 18 U.S.C. § 981(a)(2)(A).  That is true, but irrelevant to Claimants' argument.  The quoted portion of the definition simply makes clear that the Government may forfeit the gross receipts of a criminal enterprise.  In other words, the fact that some or all of those receipts merely cover the costs of the criminal enterprise is not a valid defense to forfeiture.  But, as the Government ultimately acknowledges (Opp. 16), that principle does not relieve the Government of its burden of demonstrating that the property its seeks to forfeit was "obtained . . . as the result" of specified criminal wrongdoing.  18 U.S.C. § 981(a)(2)(A).  The Government's failure to meet that burden is the basis for Claimants' argument here, and that conclusion is unaffected by the distinction between net profits and gross receipts.

The Government also contends (Opp. 15-17) that the funds held in the Claimed Accounts constitute criminal proceeds because the alleged offense conduct allowed those funds to be placed into bank accounts in the United States.  The Government posits (Opp. 16) a "major difference" between "free-floating funds" and funds held in the United States banking system, which it maintains justifies treating the Claimed Accounts as distinct property obtained as a result of the bank fraud and false statements offenses alleged in the Complaint.  As Claimants explained in their opening brief (at 15), however, the alleged false statements that form the basis of the Complaint's forfeiture claims were made when Anicorn and Artemus were already in possession of the funds held in the Claimed Accounts and *after those funds had been introduced to the United States banking system*.  Thus, even if the Government were correct that funds held in United States banks are a distinct form of property, Anicorn and Artemus already had that form of property in their possession at the time the alleged false statements were made.

Further, there is no basis for the Government's position that depositing funds with a United States bank has such transformative significance that those funds may be regarded as new property for purposes of the forfeiture statutes.  As a matter of common parlance, it would be surpassingly odd to say that one has "obtained" funds merely by transferring them from one account to another.  Not surprisingly, the Government fails to identify any precedent for adopting that counterintuitive proposition.  See *FDIC v. Meyer*, 510 U.S. 471, 476 (1994) (noting that, in the absence of a statutory definition, courts "construe a statutory term in accordance with its ordinary or natural meaning").  Because, as a logical matter, making the allegedly false statements could not result in Anicorn and Artemus "obtain[ing]" property that they already possessed, 18 U.S.C. § 981(a)(2)(A), it follows that the funds held in the Claimed Accounts are not forfeitable proceeds of the alleged specified unlawful activity.

Left with no legal authority, the Government makes a naked appeal to policy. According to the Government, funds held in United States banks should be treated as a distinct form of property because "[b]anks are the first layer of defense against money launderers and other criminal enterprises who choose to utilize our nation's financial system to further their criminal activity." Gov't Opp. 16 (quoting *Zarrab*, 2016 WL 6820737, at *14). Even if that argument had greater practical force, however, it would not justify adopting a construction of "proceeds" that stretches the statutory definition beyond its breaking point. See, *e.g.*, *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016) ("[P]olicy arguments cannot supersede the clear statutory text."). In any event, the Government's policy argument is unpersuasive on its own terms.

Adopting the Government's expansive understanding of "proceeds" is entirely unnecessary because the Congress has responded to the policy concerns advanced by the Government by providing that, in the case of money laundering offenses, the Government may forfeit funds without demonstrating that they are the proceeds of the money laundering conduct. Under 18 U.S.C. § 981(a)(1)(A), the Government may forfeit any property "involved in" a money laundering offense criminalized by 18 U.S.C. § 1956. As explained in Claimants' opening brief (at 5 n.3, 15 n.8), however, the Government has pointedly declined to pursue a conventional money laundering theory, despite relying on allegations of the sort that would ordinarily be charged as "concealment" money laundering. The Complaint alleges that Michel and Higginbotham endeavored to "conceal" the "source" and "ownership" of the funds held in the Claimed Accounts. Complaint ¶ 48. But the Complaint fails to allege the other prerequisites for a money laundering offense—namely, that the transaction at issue "in fact involve[d] the proceeds of specified unlawful activity" and that the defendant knew that the funds represented proceeds of unlawful activity. 18 U.S.C. § 1956(a)(1).

In particular, the Complaint does not allege that funds in the Claimed Accounts can be traced to specified unlawful activity by Low.  Nor does the Complaint allege that Higginbotham knew that these funds were derived from unlawful activity by Low.  Finally, and most significantly, it does not allege that Claimants, who are innocent owners of the funds, knew this to be the case.  Presumably, the Government has failed to allege that Michel, Anicorn, or Artemus knew that the funds were derived from unlawful activity because it would be unable to prove such an allegation.

In other words, Congress has provided a path by which, when a person opens an account with what he or she knows to be unlawful proceeds and falsely or fraudulently conceals their source, the Government may pursue forfeiture of the funds.  Such a forfeiture claim would not turn on a showing that the funds are somehow the proceeds of the false statements made in opening the account into which the funds were deposited.  But the Government has not elected to pursue that path, because it cannot satisfy the requirements that Congress has imposed—namely, proving that the funds were proceeds of specified unlawful activity and that the person opening the account knew he or she was concealing unlawful proceeds.  The Government's inability to allege what the offense of concealment money laundering requires is not a reason, however, to allow the Government to evade the requirement that, if the Government seeks forfeiture based on fraud or false statements, as the Complaint does here, it must allege that the funds are proceeds of that fraud or those false statements.  Because the Complaint does not meet that requirement, it fails to state valid claims for forfeiture.

## CONCLUSION

For the reasons set forth above and those stated in Claimants' opening brief, the Complaint fails to allege a basis for forfeiture as to the Claimed Accounts.  It does not adequately allege bank fraud, false statements, and conspiracy offenses.  Nor does it adequately allege that the Claimed

Accounts are proceeds of the offense conduct alleged.  The Complaint as to the Claimed Accounts should be dismissed in its entirety.


Dated: March 5, 2019
       Washington, D.C.

Respectfully submitted.

s/ Barry J. Pollack
Barry J. Pollack (D.C. Bar #434513)
ROBBINS, RUSSELL, ENGLERT, ORSECK,
  UNTEREINER & SAUBER LLP
2000 K Street, N.W., 4th Floor
Washington, DC 20006
Telephone:    (202) 775-4500
Facsimile:     (202) 775-4510
Email:         bpollack@robbinsrussell.com

*Counsel for Claimants Anicorn, LLC, Artemus Group, LLC, and Prakazrel Michel*